## Supreme Court—General Term—First Department.

### *January,* 1882.

## SINDRAM *v.* PEOPLE.

MURDER.—PROOF OF INABILITY TO DELIBERATE.—INSANITY.—
ABSENCE OF PREMEDITATION AND DELIBERATION.—
RANGE OF INQUIRY OF JURY.—DISCRETION.

Upon the trial of an indictment for murder in the first degree, evidence to show that, for a number of years prior to the commission of the crime, the accused "had been characterized by peculiarities and eccentricities of conduct which caused criticism with reference to his capacity mentally, and that he is a person who has been known to be the victim of inordinate passion, giving expression to it in various ways and at various times," is inadmissible for the purpose of showing lack of ability to form a premeditated and deliberate design to effect death, insanity not being asserted or proved upon the trial as a defense.

There is no such thing in law as a grade of insanity that changes the crime of homicide from one degree to another. But it seems that in a proper case such evidence is admissible to show the absence of said deliberate and premeditated design.

To enable the jury to carefully inquire into the mental conditions and operations of the accused at the time the alleged offense was committed, as is demanded by the spirit and philosophy of our law of homicide, requires a reasonable range of inquiry into the nature and character of the mind charged with the felonious intent.

It rests, however, within the reasonable discretion of the trial court in such cases, to restrict and control such evidence, and to exclude it when it is not entitled to any legitimate effect upon the question of the mental condition of the accused at the time of committing the act.

Accordingly, where, as in this case, it clearly appeared upon the trial that the whole conduct of the accused showed a deliberate plan to shoot the deceased, and that nothing occurred at that time to arouse sudden passion,—*Held*, that such evidence was properly rejected.

ERROR by the prisoner to the Oyer and Terminer of the City and County of New York.

William Sindram, plaintiff in error, was tried in the Court of Oyer and Terminer, of New York county, at the December term, 1881, before BRADY, J., upon an indictment charging him with murder in the first degree, for the killing of Mrs. Catharine Crave, on January 26, 1881, by discharging at her a loaded pistol. The plea was not guilty.

The jury found a verdict of guilty of murder in the first degree. The facts, together with the objections and exceptions, appear in the opinion.

*James D. McClelland* and *William F. Kintzing*, for the prisoner, plaintiff in error.—I. The court erred in excluding the offer of prisoner's counsel : The exclusion of this testimony was erroneous, as counsel desired to show, while the prisoner was not insane to the extent of irresponsibility for the commission of any crime, still, his mind was of such a character and order that its deliberative ability was seriously impaired, if not absolutely destroyed.

While partial insanity is no defense to an indictment, still proof tending to establish such a condition of mind is admissible, especially in a case where the jury are called upon to pass upon the question of deliberation.

Precisely like evidence of intoxication, we are told that intoxication is no excuse for crime, and that it aggravates rather than mitigates the offense ; still, evidence of intoxication has been held admissible, and must be considered by the jury in passing upon the question of intent and deliberation.

In speaking of deliberation upon action, Jamison, in his work on Logic, thus describes deliberation : " When a man is urged by contrary motives, those on one hand inciting him to do some action, those on the other to forbear from it, he deliberates about it, and at last resolves to do it or not to do it." 1 *Jamison's Logic*, p. 37, ch. 4, § 83.

Thought, intelligence, intellect, or cognition, includes the powers known as perception, memory, conception, abstraction, reason, judgment, and imagination. *Wharton & Styles, Physc. Law*, § 307.

What more competent proof than to show incapacity for such functional operations, coupled with a state of stupid anger,

on the part of a defendant tried for murder in the first degree, and leaving to a jury to determine the character to be given to the homicidal act!

The mind of defendant must be capable of going through the process of premeditation and deliberation. Is it not better and safer to conclude that there are different degrees of pre-vious thought? The one instantaneous, born of a cause so sudden and exciting to the feelings that one could not call the act deliberate, and the other born of no excitement, but of thought so careful that we can designate it. Charge of WEST-BROOK, J., in People v. Hughes.

*John McKeon,* district attorney, for the people, defendants in error.

DAVIS, P. J.—On the trial of the indictment against him, the plaintiff in error was convicted of murder in the first degree, and sentenced to be executed on the 10th day of February, 1882. No stay of proceedings has been granted in his case, and it is therefore important that it be promptly considered and deter-mined by this court. We have given it the careful considera-tion that its grave character demands ; and have reached the conclusion that no error was committed upon the trial that requires us to interfere with the judgment. The principal question presented by the bill of exceptions arises upon the exclusion of evidence offered on the part of the plaintiff in error. Insanity of the accused was not averred nor claimed upon the trial. It was in effect conceded that at the time of the commission of the act the accused was sane within the established rules of legal responsibility. No evidence was offered on his behalf with intent to show the contrary, but after the people had rested their case, and had given evidence tending to show that the killing was with deliberate and premeditated design to effect the death of the deceased, and therefore murder in the first degree, a witness, on behalf of the defense, who had known the accused for several years, was asked this ques-tion: "Was your attention ever called to any peculiarities or eccentricities in his conduct?" The prosecuting attorney called upon counsel to state the object of this question, and the

counsel for the defense then stated in substance that the object was to aid the jury in passing upon the question " of the forming of a premeditated and deliberate design to effect the death of the deceased, by giving the jury such information of the history, antecedents and peculiarities and characteristics of the defendant as will assist them in coming to a conclusion" . . . . . " whether the act was the result of impulse and anger, or a premeditated and deliberate design to effect death." After considerable discussion by the respective counsel, the court excluded the evidence, and an exception was duly taken.

The counsel for the defense then made the following offer: " I offer to prove by a number of witnesses in court that for a number of years past the prisoner has been characterized by peculiarities and eccentricities of conduct which have caused criticism with reference to his capacity mentally; and also that he is a person who has been known to be the victim of inordinate passion; giving expression to it in various ways, and at various times. We offer this for the purpose of enabling the jury to consider the character, the mental condition, of the defendant prior to and in view of the circumstances of this killing, in order that they may be enabled to pass upon the grade of homicide, either as murder in the first or second degree, or manslaughter in the third degree." And after some colloquy between the court and counsel on both sides, the counsel for the defense added: " It is offered, as bearing on the quality of the act, whether murder in first or second degree, and also upon the question whether this killing does not amount, in view of the evidence, and the history we propose to show, to manslaughter in the third degree;" to which the court said : " I understand it is offered as bearing upon the question of intent and deliberation and premeditation, but at the same time not amounting to insanity; . . . . therefore the offer is rejected." The counsel for the defense again excepted. At the time those offers were made and rejected no evidence had been given to show the circumstances of the killing of the deceased, except that on the part of the people; nor was any subsequently given by or on the part of the accused tending to contradict or affect the testimony of the two witnesses who were present and saw the act of homicide. Whatever there is in the case tending to

establish a different version as to what took place at that time
was brought into the case by the proof and production, after the
defense had rested, of the letters of the accused written while
he was in prison awaiting the result of his act, and after the
result had led to his indictment of murder.   The rulings of the
court show that it was supposed that the evidence offered was
to some extent mixed up with a question of insanity.   The
evidence would undoubtedly have been received if insanity
had been asserted, for it might have had a legitimate effect in
its bearing upon that condition.   But the idea of establishing
insanity by the evidence offered was distinctly repudiated by
the counsel.   He put the offer upon the precise ground of the
bearing of the evidence upon the degree of the guilt of the
accused,   In that question insanity had and could have no place
whatever, for there can be no such thing in law as a grade of
insanity that changes the crime of homicide from one degree to
another.   Insanity excludes the idea of guilt.   No man can in
law be insane as to an act of murder in the first degree, and
sane to the same act as murder in the second degree.   Hence
it was entirely right to exclude the evidence in so far as it was
supposed to be offered upon any such hypothesis.   But it is
quite another thing when such evidence is offered, in a proper
case, to show the absence of a deliberate and premeditated
design to effect death, which our statute requires to constitute
the crime of murder in the first degree.   The statute was
designed to define and simplify the distinction between the two
degrees of murder, so that courts and juries might make no mis-
take in its application.   The first requires the killing to be with
a deliberate and premeditated design to effect death.   The second
requires a felonious intention to kill, without such deliberate and
premeditated design.   These degrees are made for the purpose
of affixing the penalties—to the former, death; to the latter,
imprisonment for life.   They present upon a trial the consider-
ation of the most solemn questions of fact that can be given to
a jury.   They are questions, too, of mental operation which
cannot be discerned by looking into the mind and observing its
actual workings, but only by a process of convinced reasoning
based upon established facts, which lead the minds of the jury
to see in the mind of the accused the required condition which

accompanied and caused the criminal act.    Hence it is of im-
portance in such cases that a jury shall know, so far as practi-
cable, the character of the mind with which they are called upon
to deal.    The law recognizes, in all the various degrees of
criminal homicide, not only gradations of mental operations and
intentions, but the strength as well as the weakness of human
passions and human nature ;  not to excuse from crime, but to
denote and adjust the suitable punishment.    To killing with
deliberate and premeditated design it awards death ;  to killing
with mere felonious intention, imprisonment for life ; to killing
without intention, in the heat of passion, with a deadly weapon,
by gross negligence, or in any of the other modes defined by the
statute, it accords punishment ranging from long terms of im-
prisonment, down to the lightest sentence that courts can
pronounce.    The spirit and philosophy of our law of homicide
cannot be carried into just effect without careful inquiry on the
part of juries into the mental condition and operations of the
accused party at the time his alleged offense was committed ;
and this requires a reasonable range of inquiry into the nature
and character of the mind charged with a felonious intent.    It
would have been no error, therefore, in our judgment, to have
admitted the offered evidence, or such portions as bore reason-
able proximity to the crime.

But there must be a reasonable discretion in a trial court, in
such cases, to restrict and control such evidence, and to exclude
it when it is not entitled to any legitimate effect upon the
question of the mental condition of the accused at the time of
committing the act.    In this case the evidence on the part of
the people showed in substance that the accused, after having
been excluded from the room he had previously occupied, by
the direction of the deceased, returned the following morning
at half-past ten, armed with a revolver, all the barrels of which
(four in number) were loaded, and entered the house of the
deceased by means of his pass-key.    While standing in the hall
he was asked by the deceased what he wanted there, to which
he answered that he wished to see her mother (the deceased).
The daughter asked, " What for ?" and his answer was, " Never
mind ; I want to see your mother."    The deceased was returning
from the attic of the house, and hearing this conversation, called

down to her daughter, saying, " Who is there ? " The daughter answered, " It is that Willie Sindram." " What does he want in the house now ? he has no right in the house now," said the deceased. The prisoner said, in a cross and angry tone, " Come down here, and I will show you what I want !" The daughter then started to go up the stairs, and the deceased had reached the landing above. The prisoner drew his pistol from his pocket, and held it down by his side. The daughter saw the pistol, and cried out to the deceased, " Mother, run ! he has a pistol ! he is going to kill you !" The deceased ran from the landing, and the prisoner, pushing the daughter aside, ran up the stairs, and as the deceased was raising a window, crying " Murder ! police ! help ! " he extended his arm and fired at her. When the deceased heard the shot she left the window and crouched down in the corner of the hall, and the prisoner went up to her, and putting the pistol within three inches of her head, fired the fatal shot of which she afterward died. He then ran down stairs with the pistol in his hand, and out of the house, and fled. This is substantially the testimony of the two witnesses who saw the transaction. One of them (the daughter) said he looked very angry ; the other, a woman who lived on the floor where the shooting occurred, said the prisoner acted coolly. Nothing occurred between the deceased and the accused on that morning which could have awakened any sudden anger. They had not seen each other on the night before, when he left the house. One of the persons present in the room testified that he said he would return in the morning and make a " bloody row." The other witness then present testified that he did not hear any such threat. But it is clear, upon the testimony, that he came back to the house armed for an evil purpose ; that he drew his pistol and held it concealed by his side ; that when he saw the deceased was not coming down he rushed up the stairs and fired as she was seeking to give the alarm ; and then, as she crouched in fear, he deliberately walked up to her and shot her in the head, under circumstances where it was impossible to miss his aim; and then, as she fell, fled from the house. His whole conduct showed a deliberate plan to shoot the deceased. Nothing occurred at that time to arouse sudden passion. His anger was kept in restraint for the purpose of

revenge. There could have been no legitimate connection with the eccentricities and peculiarities or passions, which it was offered to show had been exhibited years before, and on previous occasions of his life ; for proving them could not have shown that he was acting otherwise than with the cool, deliberate purpose with which he carried out his design. To exclude the offer under such circumstances was not error. Nor would the admission of the evidence have been of the slightest benefit to the accused. Nothing was offered in immediate connection with his act ; and when that was shown to be a carefully conducted act of revenge, it was a proper exercise of discretion to exclude the offer made on his behalf. We are of opinion, therefore, that no error was committed in the rulings excepted to. We have examined with care all the exceptions taken to the charge, and are of opinion that none of them was well taken. If there were any just grounds of criticism to the charge as first given, the court carefully corrected them when attention was called to them by the counsel for the prisoner. The court also charged in accordance with a large number of requests made by the counsel, and in so doing presented with clearness and precision the several questions to be considered by the jury, and the rules and principles of law by which the jury were to be governed. We are not able to see that any error was committed upon the trial which requires any interference with the verdict and judgment. The conviction and judgment must therefore be affirmed.

DANIELS, J., concurs.

NOTE.—Affirmed, 88 *N. Y.* 196.